IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| 1-800 CONTACTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LENS.COM, INC. d/b/a/ LENS.COM, JUSTLENS.COM and JUSTLENSES.COM,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:07-cv-591 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

The parties in this action sell replacement contact lenses over the Internet.  1-800 Contacts, Inc. ("Plaintiff") is the owner of certain service marks and contends that Lens.com, Inc. ("Defendant") has used the service marks in commerce without its consent.  Specifically, Plaintiff contends that Defendant and its affiliates bid on the service marks as keywords to generate a sponsored link for Defendant on Google and other search engines.  Moreover, because Defendant's sponsored links were generated when a consumer entered "1800Contacts" as the search term, the sponsored links were likely to cause confusion as to source, affiliation, or sponsorship.

Plaintiff moves for partial summary judgment on its claims for trademark infringement and secondary liability.  It also moves for summary judgment on Defendant's defense that its use of Plaintiff's mark as a keyword is not a "use in commerce."  Finally, it moves for summary judgment on Defendant's descriptiveness and fair use defenses.  In turn, Defendant moves for summary judgment and seeks dismissal of all claims and causes of action in the Amended Complaint.  The

court grants Plaintiff's motion on Defendant's defense that purchase of a keyword is not a use in commerce.  The court otherwise denies Plaintiff's motion for summary judgment.  Although purchase of a keyword is a use in commerce, Defendant is nonetheless entitled to summary judgment on all claims and causes of action in the Amended Complaint for the reasons discussed below.

## FACTUAL BACKGROUND[1]

**General Business Facts**

Plaintiff sells replacement contact lenses through various channels, including the Internet. It owns two service marks, which were registered in 2003.[2]  One service mark is the word mark "1 800CONTACTS" and the other service mark is the following stylized word mark:



Because the marks have been in use for more than five years, they are statutorily incontestable.[3] Since its inception in 1995, Plaintiff has spent over $220 million in advertising through television, radio, newspapers, the Internet, e-mail, and direct mail.[4]  Between 2003 and 2008, Plaintiff spent $11 million advertising with Google alone.[5]  For at least five years, Plaintiff has retained Synovate to

---

[1]  The parties filed their memoranda and exhibits under seal.  The court has considered the information disclosed in this decision to determine whether it warrants sealing the decision.  The court concludes that the disclosed information does rise to the level that preclusion of publication is necessary.

[2]  Service Mark, Reg. No. 2,675,866 (Jan. 21, 2003) (Dkt. No. 181, Ex. 2); Service Mark, Reg. No. 2,731,114 (Dkt. No. 181, Ex. 3).  For purposes of the court's analysis, there is no distinction between a service mark and a trademark.

[3]  *See* Combined Declaration of Use & Incontestability (Dkt. No. 181, Exs. 4–5).

[4]  Declaration of Allen Hwang, ¶ 8 (Dkt. No. 181, Ex. 1).

[5]  *Id.*

conduct "awareness" surveys to determine the strength of its service marks.  In 2008, Plaintiff's mark ranked first in consumer awareness among contact lens wearers.[6]

Defendant also sells replacement contact lenses, and has been in competition with Plaintiff since 1998.  It owns the service mark "1-800-GET-LENS."[7]  The service mark was registered on May 21, 2002 by another company, but Defendant subsequently acquired the mark.[8]  Defendant also has previously claimed common trademark rights to "1-800 Lens.com" and recently obtained federal registration of it.[9]  Unlike Plaintiff, Defendant only advertises on the Internet.  Between 2003 and 2008, Defendant spent between $3 million to $4.7 million in Internet advertising.[10]  Besides marketing and selling contact lenses in similar channels of trade, Plaintiff and "Lens.com sell essentially the same contact lens products and directly compete for customers."[11]

**Google Search Results**

"Google is an Internet company that owns and operates one of the world's most utilized internet search engines."[12]  "A search engine is a computer program that allows web users to search

---

[6] Synovate Research Reports (2008) (Dkt. No. 182, Ex. 8, Attach. B).

[7] 1-800-GET-LENS, Reg. No. 2,571,563 (May 21, 2002) (Dkt. No. 179, Ex. 15 at 3).

[8] Trademark Assignment Abstract of Title (Dkt. No. 200, Ex. 44).

[9] *See* 1-800 Lens.com, Reg. No. 3,875,337 (Nov. 16, 2010).  Defendant further claims common law trademark rights in "Contacts America" and "Just Lenses."

[10] *Compare* Lens.com's Response to Statement of Background & Material Fact, ¶ 14 (Dkt. No. 209, Ex. 36) *with* Declaration of Theodor Tatos, ¶ 35 (Dkt. No. 179, Ex. 3) (hereinafter "Tatos Decl.").

[11] Lens.com's Response to Statement of Background & Material Fact, ¶ 16.

[12] *Rosetta Stone Ltd. v. Google Inc.*, No. 1:09cv736, 2010 U.S. Dist. LEXIS 78098, at *6 (E.D. Va. Aug. 3, 2010) (citation omitted).

the World Wide Web for websites containing particular content."[13] When a search term is entered, the search engine compares the term "against its databases and applies a formula or algorithm to produce a search-results page that lists the websites that may relate to the user's search terms."[14] Google's search engine has a "natural or organic system that lists results in order of objective relevance to the search terms input into the search engine, with the most relevant websites appearing near the top of the web page."[15] In addition, the search-results page lists paid advertisements "above or to the right of the organic search results."[16] These paid advertisements are referred to as "sponsored links."

"Google's AdWords program is the keyword-triggered advertising program that generates the Sponsored Links section on the search-results screen."[17] Advertisers bid on certain words or phrases, known as "keywords."[18] When a user's search term matches an advertiser's keyword, a sponsored link appears for that advertiser. The order and location of the sponsored link depends on the amount bid for the keyword *and* the quality of the advertisement.[19] Consequently, the advertiser does not pay to be listed in a specific order on the search-results page.

---

[13] *Id.* at *7 (citation omitted).

[14] *Id.* (citation omitted).

[15] *Id.* at *7–8 (quotation marks and citation omitted).

[16] *Id.* at *9 (citation omitted).

[17] *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-0597, 2007 U.S. Dist. LEXIS 288, at *5 (E.D. Pa. Jan. 4, 2007).

[18] *Id.* at *5.

[19] *Rosetta Stone Ltd.*, 2010 U.S. Dist. LEXIS 78098, at *9–10.

When bidding on a keyword, an advertiser "may specify whether keywords should be applied as a 'broad match,' 'phrase match,' 'exact match,' or 'negative match.'"[20]   When an advertiser designates a keyword as a "broad match," its sponsored link will appear anytime "a search is conducted for that keyword, its plural forms, its synonyms, or phrases similar to the word."[21]   When an advertiser designates a keyword as a "phrase match," its sponsored "link will appear when a user searches for a particular phrase," even if the user includes other terms before or after the phrase.[22]   When an advertiser designates a keyword as an "exact match," then its sponsored link will appear "only when the exact phrase bid on is searched on Google."[23]   In contrast, when an advertiser designates a keyword as a "negative match," the advertiser "ensure[s] that its link [will] not appear when certain terms are searched."[24]   For example, a contact lens seller may specify that its link should not appear when the phrase "contact lists" is entered.[25]

Both parties in this action pay for advertisement on a "cost-per-click" basis.  This means if a keyword generates a sponsored link, but the Internet user does not click on that link, the advertiser does not pay for its link appearing on the search-results page.  The appearance of an advertiser's link

---

[20] *FragranceNet.com, Inc. v. Les Parfums, Inc.*, No. 09-cv-2626, 672 F. Supp. 2d 328, 331 (E.D.N.Y. 2009).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Tatos Decl., ¶ 34 (Dkt. No. 179, Ex. 3).

on a user's computer is called an "impression."[26]   An advertiser selects the language used in the impressions it generates.   The language can be important in capturing a user's attention so the user will click on the link to an advertiser's website.   An advertiser can gauge the success of an impression by calculating how many impressions occur in comparison to the number of clicks.   It is undisputed that many more impressions occur than clicks.

**Impressions and Conversion Rates**

It also is undisputed that not every click results in a sale.   When a click does result in a sale, it is called a "conversion."   According to a summary of Google AdWords Data, an impression for Plaintiff's link occurred about 99 million times between the years 2003 and 2008.[27]   Approximately 2.5 million of the impressions were generated by five keywords that are Plaintiff's mark or close variations.[28]   Approximately 2.5 million additional impressions were generated by keywords that Plaintiff contends are other variations of its mark for a total of about 5 million impressions between the two categories.[29]   The remaining 94 million impressions were generated by keywords that Plaintiff does not contend are its trademark.[30]   In particular, about 34 million impressions (about 34 percent) occurred based on the non-trademarked keywords, "Contacts; Contact Lenses; Contact

---

[26]  *Id.* ¶ 17.

[27]  Summary of Google Adwords Data for 1800Contacts (Dkt. No. 182, Ex. 9, Attach. L).

[28]  *Id.* at "Top 5 TM Keywords" section.  Plaintiff presented evidence that fewer impressions appear when Lens.com is used as a keyword.  The strength of Defendant's mark, however, is not at issue here.

[29]  *See id.* at "All TM Keywords" section.

[30]  *Id.* at "All Non-TM Keywords" section.

Lens; contact; lenses, lens."[31]  This means that 95 percent of the time, "1800Contacts" was not the keyword that generated the impression for Plaintiff's link.  Thus, most consumers do not search for "1800Contacts" specifically when they search the Internet for a contact lens supplier.

When Plaintiff's link has appeared in response to a generic or brand name keyword, 1-800 Contacts only had a conversion about 5 percent of the time.  When "1800Contacts" or a variant thereof was the keyword, Plaintiff had a conversion about 23 percent of the time.  This data does not establish the search term used by consumers, which may have been different from the keyword, nor the type of "matching" of the keyword.   It does show, however, that Plaintiff experienced a higher conversion rate when its service mark was the keyword that generated a "1800Contacts" impression.

**Keywords Purchased by the Parties**

Both parties purchase thousands of different keywords in an effort to direct traffic to their respective websites.  Defendant alone purchased 8,016 keywords that pertained to contact lenses and different brands of contacts.[32]  Among these keywords, were the following: 1 800 contact lenses; 1800 contact lenses; 800 contact lenses; 800comtacts.com; 800contacta.com; 800contavts.com; 800contaxts.com; 800contzcts.com; and 800conyacts.com.[33]   These nine keywords generated about1,626 impressions, 25 clicks, and $20.51 in profits.[34]  Although the keywords consisted of

---

[31]  *Id.* at "Common Non-Branded, Non-TM Keywords" section.

[32]  Tatos Decl. ¶ 37 (Dkt. No. 179, Ex. 3).

[33]  *Id.* ¶ 23.

[34]   *Id.* ¶¶ 39–40.  There is evidence that Defendant's purchase of misspelled keywords remained active through September 2008, generating 18 impressions and 1 click.  *Id.* ¶ 43. Additionally, Defendant purchased misspelled keywords from other search engines besides Google, for which Defendant paid approximately $0.96.  *Id.* ¶ 44.

variations and misspellings of Plaintiff's service mark, none of them are Plaintiff's actual service mark.  Plaintiff has presented no evidence to show that Defendant ever purchased Plaintiff's exact service mark as a keyword.[35]  Rather, Plaintiff stated in its briefing that it "has never denied that the extent of Lens.com's Google purchases led to 1600 impressions in 2005."[36]

In comparison, from about 2002 through 2008, *Plaintiff* purchased the following keywords from Google:  1 800 lens; 1 800 lense; 1 800 lenses; 1 800 the lens; 1 800 Lens; 1-800 lens; 1800 lenses; 1800lens; 1800lenses; 1-800-lenses; 800 lens; 800 lenses; 800lens.  These keywords generated 91,768 impressions, 8,477 clicks, and about $219,314 in profits for Plaintiff.[37]  Based on the similarity of these keywords to Defendant's service marks "1-800 Lens.com" and "1-800-GET LENS," Defendant asserts that Plaintiff cannot claim infringement when it has engaged in the same behavior as Defendant.[38]

---

[35]  Plaintiff did present the Declaration of Frank Gollop, which asserts that Defendant used Plaintiff's service mark as a keyword.  (Dkt. No. 182, Ex. 9).  He submitted a summary of the dates of the alleged use.  (*Id.* at Ex. 9, Attach. B.)  The top of the page states it summarizes screen shot data, but the legend states is summarizes keyword data.  Screen shot data does not prove what the keyword was.  Throughout its pleadings, Plaintiff has *not* been careful in keeping these two concepts separate.  Because none of the underlying data was presented for the summary, the court is unable to determine whether the summary addresses screen shots or keywords.  Hence, the summary does not establish that Defendant used Plaintiff's service mark as a keyword during the stated time periods.  Notably, Gollop's other attachments do show keyword data, but none of them show usage by Defendant of Plaintiff's specific service mark.  (*Id.* at Ex. 9, Attach. C–E.)  Thus, Plaintiff has not presented any admissible evidence that shows Defendant bid on Plaintiff's actual service mark.

[36]  Reply Mem. in Supp. of Mot. for Sum. Jdgmt., at 22 (Dkt. No. 232).

[37]  Tatos Decl. ¶ 47 (Dkt. No. 179, Ex. 3).

[38]  Although Defendant has only recently obtained federal trademark protection in "1-800 Lens.com," it has asserted a use in commerce since 2004 and common law trademark rights.

**Affiliate Marketing**

Although Defendant itself has not purchased Plaintiff's specific service mark as a keyword, some of its affiliates have made such purchases. Advertisers hire persons called "affiliates" to help them with marketing. Often, the advertiser and affiliate do not have a direct relationship. Rather, a company establishes an affiliate network, and the advertiser deals directly with the company instead of the affiliate. Commission Junction is one of the largest companies that oversees an affiliate network. There are "a number of different ways" to conduct affiliate marketing.[39] Under one way, the affiliate bids on keywords related to an advertiser's product and develops the language for an impression. To a consumer, the impression appears "to be direct links to an advertiser's website."[40] When a user clicks on that affiliate's impression, the user is seamlessly taken through a number of websites before reaching the advertiser's website.[41] "This process enables Commission Junction to determine which affiliate generated the 'click,' so that commissions can be properly paid . . . ."[42]

Under another way, an affiliate actually establishes its own website.[43] When a consumer clicks on an impression, the consumer is taken to the affiliate's website, which contains links to an advertiser's website for product purchases. At times, an affiliate's website will contain

---

[39] Declaration of Peter Figueredo, ¶ 13 (Feb. 2, 2009) (Dkt. No. 179, Ex. 5).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶ 14.

advertisements from competing companies to present the consumer with different choices.[44]

Advertisers who use the Commission Junction network enter into a Commission Junction Access Advertiser Service Agreement (the "CJ Advertiser Agreement").  The agreement authorizes use of the advertiser's web links, trademarks, and services marks for the purpose of promoting the advertiser.[45]  These rights are then sub-licensed to affiliates.[46]  The agreement also authorizes advertisers to terminate an affiliate who fails to comply with an advertiser's program details or who breaches an advertiser's intellectual property rights.[47]  The termination only precludes the affiliate from working on the advertiser's account.  It does not terminate the affiliate from the Commission Junction network.  The CJ Advertiser Agreement further specifies that the parties to the agreement shall be independent contractors and nothing in the business dealings "shall be construed to make them joint venturers or partners with each other."[48]

In turn, affiliates who join the Commission Junction network enter into a Commission Junction Publisher Service Agreement (the "CJ Affiliate Agreement").  Under this agreement, the affiliate agrees to abide by an advertiser's program details.[49]  It agrees that none of its promotional materials will "contain objectionable content."[50]  The affiliate further warrants that its website will

---

[44]  *Id.*

[45]  CJ Access Advertiser Service Agreement, ¶ 4.1 (Dkt. No. 179, Ex. 22).

[46]  *Id.*

[47]  *Id.* ¶¶ 2.2, 4.2.

[48]  *Id.* ¶ 9.1.

[49]  Commission Junction Publisher Service Agreement, ¶ 1 (Dkt. No. 180, Ex. 24).

[50]  *Id.* ¶ 2(b).

not infringe another's rights under any promotional methods.[51]  The affiliate also agrees that it "shall remain solely responsible for any and all Web sites owned and/or operated by [it] and all of [its] promotional methods."[52]  Additionally, the CJ Affiliate Agreement specifies the parties' relationship is "solely that of independent contractors" and does not create a partnership or joint venture.[53] Plaintiff did not present evidence of any direct contract between Defendant and its affiliates.

**Defendant's Affiliates**

Defendant used Commission Junction's affiliate network to market four separate accounts: Lens.com (3,881 affiliates); JustLenses (2,683 affiliates); 1-800-GET-LENS (2,036 affiliates); and Contacts America (1,941 affiliates).[54]  Affiliates may choose to market more than one account, but each "account[] is separate and distinct."[55]  Consequently, while some affiliates may have signed up to market more than one account, Defendant still had over 10,000 affiliate relationships.[56]

Out of this number, Plaintiff presented evidence that two of the affiliates purchased Plaintiff's service mark as a keyword in 2007.[57]  With respect to affiliate Ryan McCoy, Plaintiff

---

[51]  *Id.* ¶ 7(c).

[52]  *Id.*

[53]  *Id.* ¶ 9(c).

[54]  Declaration of Cary Samourkachian, ¶ 15 (Feb. 2, 2009) (Dkt. No. 179, Ex. 13). Samourkachian stated these figures in his declaration without providing foundational information as to how he knows them.  Plaintiff, however, did not dispute his assertions.  The court therefore accepts them as true.

[55]  *Id.* ¶ 16.

[56]  *Id.*

[57]  Plaintiff mentioned two other affiliates, but did not develop information about them in its motion.  Consequently, the court will not address them.  During this litigation, Defendant has been

contends that 550,000 impressions of the "justlenses.com" link occurred in response "to customers searching for 1-800 Contacts" due to an employee of McCoy purchasing Plaintiff's trademark as keywords.[58] Among others, McCoy's employee bid on the following keywords: 1800contacts; 1800 contacts; 1800 contact; 1-800 contacts; 1-800-contacts; 1800 contact lens; 1800 contact lenses; 1 800 contacts.com; 1-800-contacts.com.[59]  The following impressions were generated by the keywords:

1.  <u>Buy Contacts Online</u>
    Simple online ordering of lenses.
    Compare our prices and save!
    www.JustLenses.com

2.  <u>1-800 Contacts</u>
    Simple online ordering of lenses.
    Compare our prices and save!
    www.JustLenses.com

3.  <u>1800 Contacts: Buy Online</u>
    Simple online ordering of lenses.
    Compare our prices and save!
    www.JustLenses.com

---

sanctioned for discovery abuses.  Plaintiff contends these abuses precluded it from discovering all keyword usages by Lens.com affiliates.  Defendant contends it did not have access to the requested affiliate information.  Regardless, Plaintiff was able to and did subpoena third-party information from Commission Junction, which information was comprehensive.  *See* Deposition of Joseph R. McGinnis, 11:23–12:8 (Aug. 8, 2008) (Dkt. No. 229, Ex. 69); *see also* Declaration of Joseph R. McGinnis, ¶ 3 (Dkt. No. 182, Ex. 9, Attach. F) (confirming that Commission Junction produced about 31,000 pages of discovery); *see generally* Declaration of Matthew Stone, ¶¶ 2–3 (Jan. 13, 2009) (Dkt. No. 182, Ex. 16) (confirming that Google, Inc. produced documents in response to subpoenas by Plaintiff).  From this information, Plaintiff has presented specific information to the court about two affiliates.

[58]  Plaintiff's Memo. in Supp. of Mot. for Sum. Jdgmt., ¶ 25.  Although about 550,000 impressions occurred, the court notes that some of the impressions actually were generated by other keywords, such as "coastal contacts" and "lens.com."  *See* Report re: Placement/Keyword, Ryan McCoy Account Data (Dkt. No. 200, Ex. 23, Attach. F).

[59]  Report re: Placement/Keyword, Ryan McCoy Account Data (Dkt. No. 200, Ex. 23, Attach. F).

McCoy's employee drafted the language for the impressions.[60]  The first impression occurred about 489,000 times and resulted in 3,163 clicks.  The second and third impressions, together, occurred about 65,183 times and resulted in 352 clicks  (hereinafter the "Infringing  Impressions").[61] Defendant acknowledges that the second and third impressions "present a different issue for consumers than does" the first impression.[62]

With respect to affiliate Dustin Goggan, Plaintiff contends that 240,000 impressions and 1,445 clicks occurred in response "to customers searching for 1-800 Contacts" due to Goggan purchasing variations of its trademarked as keywords.[63]  Unlike the other affiliate, none of Goggan's impressions referred to "1800Contacts" anywhere in his advertisements.  Instead, his impressions stated the following or had similar variations:

> LensWorld.com 75% Off
> Up to 75% off Retail Price!
> Free Shipping on Orders Over $89
> www.LensWorld.com

---

[60]  Deposition of Ryan James McCoy, 53:17–54:3 (Nov. 21, 2008) (Dkt. No. 179, Ex. 18).

[61]  Google AdWords Report, at 4 (Dkt. No. 200, Ex. 23, Attach. E).  These figures do not factor out impressions and clicks that were generated by non-trademarked keywords.  Consequently, the figures are likely inflated slightly.  Although the court refers to the 65,000 impressions as the "Infringing Impression," this is done for ease of reference only and not as a factual or legal conclusion.

[62]  Lens.com's Response to Statement of Background & Material Fact, ¶ 25.1 (Dkt. No. 209, Ex. 36).

[63]  Plaintiff's Memo. in Supp. of Mot. for Sum. Jdgmt., ¶ 25.  There is evidence that Goggan also purchased Plaintiff's trademark as a keyword in 2008.  Ultimately, this fact doe not change the court's conclusions.

> JustLenses.com Savings
> Up to 70% off Retail Price.  Name
> Brand Contacts & Low Prices.
> www.JustLenses.com[64]

Because *Lens.com's* Google purchases only amounted to about 1,600 impressions, Plaintiff acknowledges "the primary thrust of this cases involves the keyword activities of *Lens.com Affiliates*."[65]

**2005 Demands to Cease Use**

As part of its business practice, Plaintiff conducts searches on the Internet that use its service mark or variations of it as the search term.  On the search-results page, if an impression for a competitor appears, Plaintiff presumes the competitor has purchased its service mark as a keyword. On or about September 1, 2005, Plaintiff's in-house counsel sent a letter to Defendant, which alleged that Defendant was "engaged in a targeted scheme to infringe upon the 1800 CONTACTS trademark."[66]  The letter further alleged that an advertisement for Defendant was "triggered upon a search for '1800 CONTACTS' and thus, uses the 1800 CONTACTS trademark as a triggering keyword to advertise for your directly competitive goods and services."[67]  Plaintiff then demanded that Defendant cease (1) all infringing activities and (2) from having its advertisement appear in response to the "1800 CONTACTS" search term.[68]  Plaintiff further demanded a response within

---

[64]  Google AdWords Report, at 90 (Dkt. No. 200, Ex. 23, Attach. E).

[65]  Reply Mem. in Supp. of Mot. for Sum. Jdgmt., 22 (Dkt. No. 232) (emphasis added).

[66]  Letter re: Trademark Infringement of 1800 CONTACTS Trademark (Sept. 1, 2005) (Dkt. No. 180, Ex. 31, Attach. A).

[67]  *Id.*

[68]  *Id.*

seven days to confirm Defendant would "comply with our demands."[69]

After receiving no response, Plaintiff's outside counsel sent a letter on or about September 20, 2005 that made similar allegations.  The letter demanded a response within ten days or counsel would "take appropriate action as authorized by our client."[70]  Defendant's counsel responded to the letter by e-mail on September 21, 2005.  He stated, "We have looked into this matter and have determined that some of our affiliates appear to be involved in the problems you outlined.  Upon identifying the appropriate individuals we will advise them to cease purchasing 1-800-CONTACTS from Google."[71]

The following day, Plaintiff's counsel sent a return e-mail thanking Defendant's counsel for discussing the matter with him that morning.[72]  He further stated, "[w]e appreciate your client's willingness *to work towards* an amicable solution on this matter."[73]  He then listed twenty terms and asked Defendant and its affiliates to implement negative matching for the specified terms.[74]  Finally, he asked for a letter from Defendant about what actions Defendant would take "to prevent this issue

---

[69]  *Id.*

[70]  Letter re: Unauthorized Use of the 1800CONTACTS and 1800 CONTACTS Trademarks (Sept. 20, 2005) (Dkt. No. 180, Ex. 31, Attach. B).

[71]  E-mail re: Unauthorized Use of 1800 CONTACTS Trademark (Sept. 21, 2005) (Dkt. No. 180, Ex. 31, Attach. C).

[72]  E-mail re: Unauthorized Use of 1800 CONTACTS Trademark (Sept. 22, 2005) (Dkt. No. 200, Ex. 37, Attach. D).

[73]  *Id.* (emphasis added).

[74]  *Id.*

from arising in the future."[75]  Plaintiff did not point to any letter to indicate Defendant complied with this request.

On or about November 30, 2005, Plaintiff's outside counsel sent an e-mail to Defendant's counsel.  It informed him that Defendant's ads were again appearing on Google and Yahoo in response to certain search terms.[76]  The e-mail then stated:  "We appreciate the prompt action you have taken in the past in resolving these situations with your affiliates.  We hope for a continued amicable relationship in resolving these situations."[77]  It then asked for details about how Defendant would resolve the latest situation.  A similar e-mail was sent on December 7, 2005 regarding Defendant's ads appearing on "search.aol.com."[78]  That same day, Defendant's counsel replied by e-mail that he would have his "client look into your statements and see if we can determine who is doing it."[79]  Plaintiff made no further complaints until April 2007.

**2007 Demand to Cease Use**

In April 2007, Defendant again was notified by e-mail that impressions for its link were appearing when certain search terms were entered.  This time, Plaintiff's counsel complained that Defendant's sponsored links were appearing on Google and Yahoo when the following search terms were used:  1 800 contact, 1800contact, 800 contacts, 800contacts, 1-800contacts.com, lens express,

---

[75]  *Id.*

[76]  E-mail re: Unauthorized Use of 1800 CONTACTS Trademarks, 2 (Nov. 30, 2005) (Dkt. No. 180, Ex. 31, Attach. D).

[77]  *Id.*

[78]  *Id.* at 1–2.

[79]  *Id.* at 1.

and lensexpress.[80]

Plaintiff's counsel stated in the e-mail, "[w]e recognize that your client works with an affiliate network and some of the advertisements may not be generated directly by your client. We appreciate the prompt action you have taken in the past in resolving these situations with your affiliates. We hope for a continued amicable relationship in resolving these situations."[81]

Plaintiff attached multiple screen shots to the e-mail. Significantly, none of the screen shots was of the Infringing Impressions. Nor was any privacy report included to show from where an impression may have originated.[82]

Defendant's counsel responded by e-mail the same day. He stated that he would "speak with my client and see if we can determine why these sponsored listings are appearing. As you know, my client has a trademark for LENS and I assume you do not expect him to take any steps to stop his links from coming up when the word lens is a search term. That issue asie [sic], we will seek to determine why the other searches trigger a sponsored link."[83]

In August 2007, Plaintiff filed suit against Defendant because it allegedly had taken no action to correct the latest complaint. In October 2007, Commission Junction put Defendant in touch with an affiliate. Defendant informed the affiliate to implement certain negative keywords such as "1-

---

[80]   E-mail re: Unauthorized Use of 1800 CONTACTS Trademarks, at 1 (Apr. 16, 2007) (Dkt. No. 180, Ex. 31, Attach. E).

[81]   *Id.*

[82]   *See id.* Additionally, some of the screen shots did not show a link for lens.com, or one of its other accounts, so it is unclear why they were attached.

[83]   *Id.*

800-Contacts."[84]  In November 2007, Defendant sent an e-mail to Commission Junction and asked

it to identify which affiliates were generating certain impressions.[85]  It also asked Commission

Junction to notify those affiliates to stop bidding on certain keywords so the "offending" impressions

would cease.  On the same day the e-mail was sent, Commission Junction was able to identify the

affiliates and inform them to cease bidding on certain keywords.[86]  The affiliates complied

immediately.  The affiliates who bid on the allegedly infringing keywords were McCoy's employee

and Goggan, as discussed above.  Several other affiliates bid on variations of the keywords.

Defendant contends that it cannot tell from a screen shot or "privacy report  alone . . . which

affiliate in the Commission Junction network caused the sponsored link to appear."[87]  Moreover,

even if it could identify the affiliate, Defendant contends that it typically does not have access to the

affiliates contact information.[88]  Commission Junction generally keeps its affiliate information

confidential.[89]  E-mails exchanged with Commission Junction confirm that Defendant does not have

access to an affiliate's identifying information unless the affiliate or Commission Junction allows

---

[84]  E-mail Chain (Oct. 5, 2007 to Nov. 12, 2007) (Dkt. No. 200, Ex. 47).

[85]  E-mail Chain (Nov. 16, 2007) (Dkt. No. 209, Ex. 53).

[86]  *See* Deposition of Stephanie M. Pelton, 66–68 (Dkt. No. 180, Ex. 28).

[87]  Declaration of Cary Samourkachian, ¶ 15 (Feb. 23, 2009) (Dkt. No. 209, Ex. 41).  When an impression occurs on a screen shot, a privacy report can be generated that discloses "the intermittent links or 'hops' which a user takes in between clicking on a sponsored link and 'landing' on a . . . website."  *Id.*  Plaintiff acknowledges that "privacy reports do not reveal the actual name or identity of the affiliate."  Declaration of Brandon Dansie, ¶ 20 (Dkt. No. 200, Ex. 32).

[88]  Defendant's Supplemental Responses to Interrogatory Nos. 18, 19, & 24,  at 3 (Dkt. No. 182, Ex. 13).

[89]  Deposition of Ryan James McCoy, 15:23–24:23 (Nov. 21, 2008) (Dkt. No. 230, Ex. 75); *see also* E-mail re: Lens Violators #1–15 (2008)  (Dkt. No. 180, Ex. 25).

for disclosure.[90]  Further evidence indicates that Defendant was unaware even by what network an affiliate was employed.[91]  Additionally, Defendant contends that it was unaware of what keywords affiliates bid on and that its affiliates determine the language for the impressions generated by their purchase of certain keywords.[92]

Plaintiff disputes these contentions because an advertiser can require affiliates to institute negative matching whereby they are prohibited from generating impressions based on certain keywords.  Accordingly, Plaintiff contends that Defendant does not have to know each keyword its affiliates bid on, it only needs to ensure they do not bid on certain keywords.  Moreover,  Defendant admits that it "communicates terms for its affiliate program to Commission Junction that Lens.com uses for the engagement of affiliates for Defendant."[93] Defendant admits is "provides its Affiliates with a large selection of banners and textlinks to post."[94]

## ANALYSIS

I.      STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party

---

[90]  *See* E-mail re: Lens Violators #1–15 (2008)  (Dkt. No. 180, Ex. 25); *see also* Various E-mail Exchanges (Nov. 2007) (Dkt. No. 209, Exs. 49–56).

[91]  *See* E-mail & Spreadsheet (Nov. 16, 2007) (Dkt. No. 209, Ex. 53).

[92]  *See* Declaration of Cary Samourkachian, ¶¶ 4–13 (Feb. 23, 2009) (Dkt. No. 209, Ex. 41).

[93]  Def.'s Obj. & Responses to Plaintiff's First Req't for Admissions, No. 64 (Dkt. No. 181, Ex. 14).

[94]  *Id.* at No. 32.

is entitled to judgment as a matter of law."[95]   "Once the moving party has properly supported its

motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings

and set forth specific facts showing that there is a genuine issue for trial."[96]  "An issue is genuine 'if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[97] The

evidence and all reasonable inferences that may be drawn therefrom are construed "in the light most

favorable to the nonmovant."[98]

With respect to trademark infringement, in the Tenth Circuit, "likelihood of confusion is a

question of fact but one amenable to summary judgment in appropriate cases."[99]  "The party alleging

infringement has the burden of proving likelihood of confusion."[100]

## II.     BENJAMIN EDELMAN'S DECLARATION

Before discussing the evidence presented in the summary judgment motions, the court must

address a motion to strike Benjamin Edelman's declaration on the grounds that it exceeds the scope

of his designation as a rebuttal expert.   "Rule 26(a)(2)(C)(ii) allows the admission of rebuttal

testimony that is 'intended solely to contradict or rebut evidence on the same subject matter

---

[95] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citing Fed. R. Civ. P. 56(c)).

[96] *Id.* (citation omitted).

[97] *Id.* at 972 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[98] *Id.* (citation omitted).

[99] *Id.*

[100] *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1055 (10th Cir. 2008) (citation omitted).

identified by another party.'"[101] "A rebuttal expert report is not the proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice."[102]

On October 15, 2008, Plaintiff was granted leave to amend its complaint to add a claim for secondary liability for the purported trademark infringement of Defendant's affiliates. Defendant then moved for expert discovery to "be re-opened for the limited purpose of addressing "affiliate marketing issues that were newly raised in Plaintiff's First Amended Complaint."[103] The court granted Defendant's motion and ordered it to file an expert report no later than December 31, 2008.[104] Plaintiff was permitted to filed a rebuttal expert report no later than March 13, 2009.[105] Plaintiff did not ask for nor did the court grant it permission to designate a new affirmative expert.

Due to an anomaly in the court's order, Defendant was required to submit its new expert report and summary judgment briefing before Plaintiff was required to submit its rebuttal report. Thus, Defendant first became fully aware of Edelman's testimony when Plaintiff submitted his declaration *in support of Plaintiff' motion* for summary judgment.[106] Defendant contends that Edelman's declaration must be stricken because it is affirmative testimony rather than rebuttal

---

[101]   *Ebbert v. Nassau County*, No. Cv-05-5445, 2008 U.S. Dist. LEXIS 74213, at *40 (E.D.N.Y. Sept. 26, 2008) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).

[102]   *Id.* (quotation marks and citations omitted).

[103]   Order, ¶ 2, at 2 (Dkt. No. 139).

[104]   *Id.*

[105]   *Id.*

[106]   *See* Exhibits 1-7 to Plaintiff's Mot. for Partial Sum. Jdgmt. & Exhibit 7 thereto (Dkt. No. 181).

testimony.  Plaintiff contends the declaration properly rebuts Peter Figueredo's *expert report*.[107]

Figueredo is Defendant's expert on affiliate marketing.

As a rebuttal expert, Edelman may, at most, rebut the evidence presented by Figueredo.

Moreover, the evidence that Edelman may rebut is *only* that evidence Defendant presented in support

of its summary judgment motion, rather than the entire opinion stated in Figueredo's expert report

because Defendant did not submit the report to support its motion for summary judgment.[108]

Edelman's declaration is twenty-four pages long and its accompanying exhibits are enough

to fill a three-inch binder.  In contrast, Figueredo's two declarations total seven pages.  Comparing

Figueredo's declarations with Edelman's declaration, it is clear that Edelman is offering affirmative

testimony about affiliate marketing, and other subjects, rather than merely rebutting Figueredo's

testimony.  Moreover,  parts of Edelman's declaration are improper in that he presents evidence not

within his personal knowledge by reciting what another said in deposition and stating that testimony

as fact, he opines on facts for which no expert testimony is needed, and he draws legal conclusions

that are outside his role as an expert.  Additionally, much of Edelman's declaration consists of

argument, which is not the proper use of an expert.  Because Edelman's declaration goes beyond the

scope of the court's order (by being an affirmative expert rather than a rebuttal expert), the court

strikes all portions of his declaration that are not rebuttal testimony.  Thus, only the following

---

[107]  Plaintiff's Opp'n to Def's Mot. to Strike Declaration of Benjamin Edelman, at 11 (Dkt. No. 241).

[108]  Figueredo's expert report is more extensive than his declarations that Defendant submitted.  Defendant had the prerogative of what evidence to submit to support its motion.  It is not within Plaintiff's discretion to rebut evidence that was not presented to the court.  Thus, even though *Plaintiff* attached Figueredo's report when opposing the motion to strike Edelman's declaration, Plaintiff cannot point to the report and state it is now in evidence so Edelman can rebut it.

paragraphs of Edelman's declaration are admissible:

> Paragraphs 1–2; the first two sentences of paragraph 9; the last sentence of paragraph 22; the first four sentences of paragraph 23; the first sentence of paragraph 57; and the first three sentences of paragraph 64.

## III.   TRADEMARK INFRINGEMENT

### A.   General Background

Under the Lanham Act, "Congress recognized that every product [or service] is composed of a bundle of special characteristics and that the consumer who purchases what he believes is the same product [or service] expects to receive those special characteristics on every occasion."[109] Plaintiff's marks are registered as service marks. A "service mark" is "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."[110] Plaintiff is in the service of selling contact lenses made by other companies and uses its marks to distinguish its company from other companies that are engaged in the same service.

Plaintiff asserts that Defendant has violated Sections 32[111] and 43(a)[112] of the Lanham Act. Section 32 prohibits "the unauthorized use of any reproduction, counterfeit, copy or colorable imitation of a registered mark in a way that is likely to cause confusion in the marketplace

---

[109] *Monsanto Co. v. Haskel Trading*, 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998) (quotation marks and citation omitted).

[110] 15 U.S.C. § 1127 (2010).

[111] *Id.* § 1114.

[112] *Id.* § 1125.

concerning the source of the different products" or services.[113]   Section 43(a) addresses unfair

competition and claims "to enforce unregistered trademarks," whereas Section 32 "applies only to

registered trademarks."[114]   To prove a violation under either Section 32 or Section 43(a), the plaintiff

must establish "(1) [its] mark is valid and legally protectable;" (2) it is the owner of the mark; (3)

the defendant has used "the mark to identify goods or services," and (4) such use "is likely to create

confusion concerning the origin of the goods or services."[115]   Rather than focusing their arguments

on the distinguishing provisions of Sections 32 and 43(a), the parties direct their arguments largely

to the issues of what constitutes "use" and whether there is a "likelihood of confusion."   The court's

analysis does the same.

> **B.    Use in Commerce**
>
> > 1.    <u>Use of the Mark as a Keyword</u>

The "use" element of trademark infringement requires proof that Defendant used Plaintiff's

service mark or a confusingly similar mark in commerce.   Under the Lanham Act, a service mark

is "deemed to be [a] use in commerce . . . when it is used or displayed in the sale or advertising of

services and the services are rendered in commerce."[116]   This case is unusual because it presents two

---

[113] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009) (citing 15 U.S.C. § 1114(1)(a)) (quotation marks, alteration, and other citation omitted).

[114] *Monsanto Co.*, 13 F. Supp. 2d at 355 n.3 (quotation marks and citation omitted); *see also Tana v. Dantanna's*, 611 F.3d 767, 773 n.5 (11th Cir. 2010).

[115] *J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *9–10.

[116] 15 U.S.C. § 1127.   Recently, the Second Circuit reviewed the definition of "use in commerce" under the Lanham Act and attempted to reconcile ambiguities that exist in the statutory definition.   Under its preferred reading, one portion of the statutory definition applies only to registering and protecting a mark, while the second portion pertains to infringement under sections 1114 and 1125 of the Lanham Act.   *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 140 (2d Cir.

different types of uses: one that is invisible to consumers and another that is visible.  The purchase and use of keywords is invisible to consumers.  Of the courts that have addressed the issue, a split exists "on the issue of whether the purchase . . . of keywords that trigger advertising constitutes the type of 'use' contemplated by the Lanham Act."[117]  Because a keyword is "invisible to potential consumers," and merely operates as a "pure machine-linking function," some courts have concluded that it is not a use in commerce.[118]  In contrast, other courts have concluded that use of another's mark "to trigger internet advertisements for itself," is a use in commerce.[119]  The statutory language supports this latter conclusion.

The Lanham Act does not require use *and* display of another's mark for it to constitute "use in commerce."  Rather, "use in commerce" occurs when a mark is "used *or* displayed in the sale or advertising of services and the services are rendered in commerce."[120]  Here, Plaintiff's service mark was used to trigger a sponsored link for purposes of advertising and selling the services of Defendant.  In other words, Plaintiff's mark was used to promote Defendant's services and to

_____

2009).  The definition used in this decision is from the second portion of the statutory definition.

[117] *J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *13 (quotation marks and citation omitted).  The Tenth Circuit has not expressly addressed the issue.  While in *Australian Gold* the Tenth Circuit did discuss keywords, metatags, and Internet advertisements, the particular issue of whether purchase of a keyword constitutes "use" was not before the court.  *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006).

[118] *See id.* at *12, 17; *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 725–26 (E.D. Va. 2003).

[119] *See e.g., J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *13, 17; *Buying for the Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 323 (D.N.J. 2006).

[120] 15 U.S.C. § 1127.

provide a consumer with a link to a website where it could make a purchase from Defendant.[121] The court concludes such actions constitute a "use in commerce" under the Lanham Act.

Clear evidence has been presented that certain Lens.com affiliates purchased Plaintiff's service mark as a keyword. Thus, the "use" requirement has been satisfied with respect to the identified Lens.com affiliates. Plaintiff has not presented evidence, however, that Defendant itself purchased Plaintiff's service mark as a keyword.[122] Rather, Defendant purchased similar variations or misspellings of the mark, such as "1 800 contact lenses" and "800comtacts.com." Because infringement can occur if the mark one uses is confusingly similar to another's protected mark, if Plaintiff establishes that Defendant's use of these variations and misspellings likely would result in consumer confusion, Defendant itself may be liable under the Lanham Act for using these variations. The court therefore addresses this issue below.

2.      Use of the Mark in Advertisements

The second use at issue is the use of Plaintiff's mark, or a similar variation, by a Lens.com affiliate in Internet advertisements. Approximately 65,000 impressions were generated that used Plaintiff's mark or a similar variation of it in the advertisement. Neither party disputes that such "use" falls under the Lanham Act.

---

[121] *Buying for the Home, LLC*, 459 F. Supp. 2d at 323.

[122] In the declaration of Plaintiff's search marketing manager, he attested that Plaintiff tracked how many "exact match" searches occurred for "1800contacts" for a period in 2005. Declaration of Bryce Craven (Mar. 2, 2009) (Dkt. No. 232, Ex. 71). The declaration does not address who generated the search results, nor what keywords generated the results.

### C.     Applicable Standards for Likelihood of Confusion

#### 1.     Types of Confusion

Turning to the "likelihood of confusion" element, "[t]he Lanham Act is intended 'to protect the ability of consumers to distinguish among competing producers,' not to prevent all unauthorized uses."[123]  Consequently, even if a use is unauthorized, it does not constitute trademark infringement unless such use is likely to cause confusion.  "Confusion occurs when consumers make an incorrect mental association between the involved commercial" service providers.[124]  Confusion also exists "when a mark is likely to deceive purchasers or users as to the source, endorsement, affiliation, or sponsorship of a [service provider]."[125]

Confusion can be (1) "direct confusion," where a consumer believes "that the plaintiff is the source of the defendant's products or services;" (2) "reverse confusion," where the consumer believes "that the defendant is the source of the plaintiff's products or services;" or (3) "initial interest confusion," where "a consumer seeks a particular trademark holder's product [or services] and instead is lured to . . . a competitor by the competitor's use of the same or a similar mark."[126]  With initial interest confusion, "[e]ven though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor."[127]   Under such

---

[123]  *Utah Lighthouse Ministry*, 527 F.3d at 1052 (quoting *Two Pesos v. Taco Cabana*, 505 U.S. 763, 774 (1992)).

[124]  *John Allan Co. v. Craig Allen Co. LLC*, 540 F.3d 1133, 1138 (10th Cir. 2008) (citation omitted).

[125]  *Id.* (citations omitted).

[126]  *Australian Gold, Inc.*, 436 F.3d at 1238 (citation omitted).

[127]  *Id.* (citation omitted).

circumstances, the competitor captures "the trademark holder's potential visitors or customers" and makes use of the "trademark holder's goodwill."[128]

> ## 2.   Relevant Inquiry for Likelihood of Confusion

Notably, unlike the "use" requirement, which focuses on how a holder's mark is used by a competitor, the "likelihood of confusion" element focuses on whether "consumers *viewing* the mark" will make an improper mental association or be confused about origin or sponsorship.[129]   Indeed, "'[w]hat is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product [or service's] reputation.'"[130] Plaintiff contends that the purchase of its mark as a keyword satisfies this element because Defendant is capitalizing on its good will and reputation.   Additionally, the keyword triggers an advertisement that either directly confuses a consumer or causes initial interest confusion due to a type of "bait and switch."   Plaintiff cites to the case of *Australian Gold* to support its contention.

*Australian Gold* involved the "unauthorized resale over the internet of indoor tanning lotions."[131]   The plaintiff called its tanning lotions "Australian Gold" and "Caribbean Gold" and had registered those terms as trademarks.[132]   The plaintiff exerted control over how and where its

---

[128]   *Id.* at 1238–39 (citations omitted).

[129]   *See J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *18 (quotation marks and citation omitted) (emphasis added).

[130]   *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558–59 (10th Cir. 1984) (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976)).

[131]   *Australian Gold, Inc.*, 436 F.3d at 1231.

[132]   *Id.*

products were distributed.[133]   The defendants obtained the tanning lotions from corrupt distribution

channels and then attempted to conceal their unauthorized sale of the products over the Internet.[134]

The defendants created seven different websites that "displayed pictures and descriptions"

of the tanning lotions and used the trademarks on the site.[135]   The defendants further used the

trademarks in meta tags,[136] and purchased a preferred listing from Overture.com that guaranteed "one

of Defendants' Web sites would be among the first three listed if either of Plaintiff's trademarks was

used in an internet search query."[137]   The court concluded that these actions all attempted to

capitalize on the goodwill of the plaintiff through initial interest confusion, and thus, were a violation

of the Lanham Act.[138]

The facts of *Australian Gold* are significantly different from Defendant's actions in this case.

In *Australian Gold*, the defendants did not just use plaintiff's mark to generate a sponsored link.

Instead, they used the mark to obtain a preferred position anytime a consumer searched for the

plaintiff's trademark on the Internet.[139]   Moreover, they used the plaintiff's mark as metatags for its

website and then displayed the trademarks and plaintiff's products on its websites.  They did all of

---

[133]  *Id.* at 1232.

[134]  *Id.* at 1232–33.

[135]  *Id.* at 1233.

[136]  "A metatag is a part of a Web site that is not seen by the public, but is read by search engine web browsers and later used by the browsers to classify the Web site."  *Id.* at 1233 n.3 (citation omitted).

[137]  *Id.* at 1233.

[138]  *Id.* at 1239.

[139]  *See id.* at 1233, 1239.

this through corrupt distribution channels and deceit.  Notably, the court did *not* address whether the purchase of a trademark as a keyword alone could result in initial interest confusion.[140]

Another case Plaintiff offers to support its position is *Brookfield Communications, Inc.*[141] In that case, the defendant used the plaintiff's "mark in its meta tags [and] caused numerous search engines to display a link to defendant's web site when users searched" using plaintiff's mark on the Internet.[142]  The Ninth Circuit concluded that use of plaintiff's mark in meta tags did not create as much confusion as other uses of the mark.[143]  It noted, however, that web surfers were "taken by a search engine" to the defendant's web site, and thereby could be diverted from the plaintiff's product.[144]  It therefore concluded that "defendant's use of plaintiff's mark . . . resulted in initial interest confusion because defendant was improperly benefitting from the goodwill plaintiff developed in its mark."[145]

Here, Plaintiff contends Lens.com advertisements constitute a similar "bait and switch" that

---

[140] A review of the underlying action is instructive.  After prevailing at trial, the plaintiffs sought and received an injunction against the defendants.  The injunction precludes the defendants from "displaying any of the Plaintiffs' trademarks or names on the Internet, using any of Plaintiffs' names and trademarks in the html code or displaying any false or misleading statements on any of their websites."  *Australian Gold, Inc. v. Hatfield*, No. 5:02-cv-143, at 6 (W.D. Okla. Jul. 18, 2003).  The injunction does not address purchasing the plaintiffs' trademarks as keywords.

[141] *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999).

[142] *J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *22 (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1062).

[143] *Brookfield Commc'ns, Inc.*, 174 F.3d at 1062.

[144] *Id.*

[145] *J.G. Wentworth, S.S.C.*, 2007 U.S. Dist. LEXIS 288, at *22 (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1062).

spawns confusion.   Plaintiff asserts that whenever a Lens.com advertisement appears when a consumer enters the search term "1800Contacts," it is akin to a consumer asking a pharmacist for Advil and the pharmacist handing the consumer Tylenol.  This analogy mischaracterizes how search engines function.  A more correct analogy is that when a consumer asks a pharmacist for Advil, the pharmacist directs the consumer to an aisle where the consumer is presented with any number of different pain relievers, including Tylenol.  If a consumer truly wants Advil, he or she will not be confused by the fact that a bottle of Tylenol is on a shelf next to Advil because of their different appearances.

This analogy is supported by case law.  In *J.G. Wentworth*, a court questioned the *Brookfield* decision because of its "material mischaracterization of the operation of internet search engines."[146] "At no point are potential consumers 'taken by a search engine' to defendant's website due to defendant's use of plaintiff's marks in meta tags."[147]  Instead, "a link to defendant's website appears on the search results page as one of many choices for the potential consumer to investigate."[148] When the link does not incorporate a competitor's mark "in any way discernable to internet users and potential customers," there is "no opportunity to confuse defendant's services, goods, advertisements, links or websites for those of" its competitor.[149]

 "Likelihood of confusion" signifies more than a mere possibility.  Unless consumer confusion likely can be shown from one's use of another's mark, there is no infringement under the

---

[146]  *Id.*

[147]  *Id.*

[148]  *Id.* at *22–23.

[149]  *Id.* at *23–24.

Lanham Act.  The trouble with focusing on "use" over "confusion" is amply demonstrated in this case.  Plaintiff monitors use of its mark by others on the Internet.  It does so by entering its mark or a variation of it as a search term.  If a competitor's advertisement appears on the search-results page, it sends a cease and desist letter to the competitor to preclude the competitor's advertisement from appearing on the same page as Plaintiff.

Notably, however, ninety-five percent of the impressions for Plaintiff are triggered by non-trademarked keywords such as contacts, contacts lenses, or by brand names such as Acuvue or Focus.  When a company incorporates broad matching for terms such as "contacts or contact lenses," its sponsored link will appear even if the search term is "1800Contacts."  In other words, simply because the search term is "1800Contacts," does not mean the keyword generating the sponsored link also was 1800Contacts or a similar variation thereof.  One cannot tell from a screen shot alone what keyword generated the sponsored link.

The end result, though, is that when a consumer enters "1800Contacts" as a search term, it will see a competitor's advertisement anytime the competitor bids on "1800Contacts" "contacts" or "contact lenses" as a broad match.  If the advertisement remains the same regardless of which search term triggers it, there is no more likelihood of confusion for the advertisement triggered by the trademark versus the advertisement triggered by the generic phrases.  Nor is there any greater impact on the goodwill or reputation of the trademark holder.[150]  It is beyond dispute that a competitor cannot be held liable for purchasing a *generic keyword* to trigger an advertisement that does not

---

[150]  As stated by one court, "[w]hatever relationship exists between search terms and sponsored links, that relationship does not imply affiliation" in the same sense necessary for a Lanham Act violation.  *See Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 856 (N.D. Tex. 2009).

incorporate a holder's mark in any way, even if that competitor's advertisement appeared when a *consumer* entered a trademarked *search term*.  Given that fact, it would be anomalous to hold a competitor liable simply because it purchased a trademarked keyword when the advertisement generated by the keyword is the exact same from a consumer's perspective as one generated by a generic keyword.  Imposing liability under such circumstances would elevate "use" over consumer confusion.

As stated above, Plaintiff sends cease and desist letters anytime a competitor's advertisement appears when Plaintiff's mark is entered as a search term.  Were Plaintiff actually able to preclude competitor advertisements from appearing on a search-results page anytime its mark is entered as a search term, it would result in an anti-competitive, monopolistic protection, to which it is not entitled.  Because a consumer cannot see a keyword, nor tell what keyword generated an advertisement, the court concludes that the mere purchase of a trademark as a keyword cannot *alone* result in consumer confusion.  Accordingly, the relevant inquiry here regarding consumer confusion is not just what keyword was purchased, but what was the language of the advertisement generated by that keyword.

### D.   Factors for Determining Likelihood of Confusion

In the Tenth Circuit, the following non-exhaustive factors are considered when determining if "confusion exists between two marks:"

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the

strength or weakness of the marks.[151]

"[T]he relative importance of each individual factor will be case-specific."[152]  If other factors are relevant, they, too, must be considered.[153]  Ultimately, the court's role is to determine whether "the evidence as a whole" presents "sufficient proof of a likelihood of confusion to warrant a trial of the issue."[154]

  1. <u>Similarity of Marks</u>

  "In both confusion of source and confusion of sponsorship cases, the similarity of the marks factor constitutes the heart of [the court's] analysis."[155]  "The degree of similarity between marks rests on sight, sound, and meaning," with similarities being "weighed more heavily than differences."[156]  "The similarity between two marks is an important factor . . . because one's adoption of a mark similar to a preexisting mark not only bears independently upon the likelihood of confusion, but also may support an inference that one intended to draw upon the reputation of the preexisting mark."[157]  The "court must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected

---

 [151] *Sally Beauty Co., Inc.*, 304 F.3d at 972 (citation omitted).

 [152] *Brookfield Commc'ns, Inc.*, 174 F.3d at 1054.

 [153] *See John Allan Co.*, 540 F.3d at 1138 (citation omitted).

 [154] *Tana* , 611 F.3d at 775 n.7 (citation omitted).

 [155] *King of the Mt. Sports, Inc. v. Chrysler Corp*, 185 F.3d 1084, 1090 (10th Cir. 1999) (citations omitted).

 [156] *Sally Beauty Co., Inc.*, 304 F.3d at 972 (citations omitted).

 [157] *Vail Assocs. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 869 (10th Cir. 2008) (citation omitted).

trademark."[158]  Although no one factor is dispositive, "[o]verwhelming visual dissimilarity can defeat an infringement claim, even where" other factors "weigh in favor of the plaintiff."[159]  Here, the court must consider the degree of similarity between Plaintiff's service mark and the Lens.com advertisements appearing on the search-results page.

a.   <em>Advertisements Without Plaintiff's Mark</em>

The advertisements at issue in this case fall under two groups.  Those that did not use Plaintiff's mark or a similar variation in the advertisement and those that did.  The relevant screen shots that Plaintiff sent to Defendant in 2007 stated the following, or were variations of the following:

> Lens.com Official Site - save 70% on Contacts w/ Lens.com Great Service, Huge Lens Selections.  www.Lens.com.
>
> 1-800 -Discount **Contacts**
> www.Lens.com    Great prices.  Huge selection.  Free Delivery.  Acuvue on Sale Now.
>
> Lens.com - Contact Lenses
> www.Lens.com   Save 70% on Contact Lenses.  Easy Ordering & Fast Delivery.
>
> Buy **Contacts** Online
> Simple online ordering of lenses.
> Compare our prices and save!
> www.JustLenses.com

The closest advertisement to Plaintiff's mark is the second one listed above.  Yet, even that mark is dissimilar for both sight and sound.  Moreover, it introduces the concept of a "discount," which Plaintiff's mark does not do.  The other advertisements have no reference to "1-800."  Although both

---

[158]  *Sally Beauty Co., Inc.*, 304 F.3d at 972 (citation omitted).

[159]  *Tana*, 611 F.3d at 775 n.7 (quotation marks and citation omitted).

Plaintiff's mark and the advertisements have "contact" or "contacts" in them, the composite view of the advertisements are overwhelmingly dissimilar for both sight and sound.

The only similarity between Plaintiff's mark and the advertisements is that they all pertain to contact lenses. Because there are many providers of contact lenses, the fact that they all have the same meaning is unlikely to create consumer confusion. Moreover, the names "Lens.com" and "JustLenses" are also greatly dissimilar from "1800Contacts." Such dissimilarities sustain an inference that Defendant did not attempt to confuse consumers or draw on the reputation of Plaintiff's preexisting mark. The court therefore concludes that this factor strongly favors Defendant for these advertisements.

        b.    *Advertisements with Plaintiff's Mark*

With respect to the advertisements generated by Defendant's affiliates, approximately 65,000 impressions were generated by the following advertisements:

> <u>1-800 Contacts</u>
> Simple online ordering of lenses.
> Compare our prices and save!
> www.JustLenses.com
>
> <u>1800 Contacts: Buy Online</u>
> Simple online ordering of lenses.
> Compare our prices and save!
> www.JustLenses.com

It is apparent the advertisements used Plaintiff's mark or a close variation of it. The similarity of sight, sound and meaning strongly weighs in favor of Plaintiff for the affiliate advertisements.

        2.    <u>Intent to Copy</u>

"Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may,

-36-

standing alone, justify an inference of likelihood of confusion."[160]  In the Tenth Circuit, courts focus on "whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff."[161]  Moreover, "[a]ll doubts must be resolved against [the defendant]."[162]

Defendant's advertisements all took care not to copy or refer to Plaintiff's mark, and its chosen name also does not copy or refer to Plaintiff's mark in anyway.  These facts show Defendant did not intend to copy Plaintiff's mark.  Moreover, Defendant itself did not purchase Plaintiff's mark as a keyword.  Instead, it purchased variations of it.  Nevertheless, for this particular factor, one could argue that Defendant's purchase of the variant keywords is relevant and was done to derive benefit from Plaintiff's reputation or goodwill by generating an advertisement for Defendant.

Defendant has shown, however, that any such benefit was a *de minimus* part of its business. Defendant purchased over 8,000 keywords, of which only nine are complained about by Plaintiff. Those nine keywords generated about 1,600 impressions out of more than 112 million impressions that have been linked to Defendant between the years 2004 and 2008.[163]  This, too, demonstrates that Defendant was not targeting its marketing efforts to ride on Plaintiff's reputation or goodwill.  While all doubts must be construed against Defendant, there is insufficient evidence to create a doubt about Defendant's actions.  The court therefore concludes this factor is, at most, neutral with respect to

---

[160]  *Sally Beauty Co., Inc.*, 304 F.3d at 973 (citation omitted).

[161]  *Id.* (quotation marks and citation omitted).

[162]  *Id.* (quotation marks and citation omitted).

[163]  Second Declaration of Frank Gollop, ¶ 6 (Feb. 23, 2009) (Dkt. No. 200, Ex. 23).  The 1,600 impressions were generated from about February 2005 to September 2005.  Looking at that time frame alone, Defendant's other keywords generated more than 8.5 million impressions.  *Id.* ¶ 7.  Hence, even when the total number of impressions is limited to a specific time frame, the 1,600 impressions are *de minimus* in comparison.

Defendant.

In contrast, a Lens.com affiliate not only purchased Plaintiff's mark as a keyword, but it copied it or a close variation thereof in its advertisements. This justifies an inference of likelihood of confusion with respect only to the affiliate's actions.

### 3. Evidence of Actual Confusion

"Actual confusion in the marketplace is often considered the best evidence of likelihood of confusion."[164] Plaintiff contends it has shown actual confusion based on a survey conducted by Carl Degen. As stated in a separate decision, the court granted Defendant's motion to strike Degen's consumer-confusion survey and those portions of his expert report and declarations that dealt with consumer confusion. Moreover, in deposition, Plaintiff admitted it knew of no actual case where a consumer was confused by a Lens.com advertisement appearing after a consumer entered a search for Plaintiff.[165] Consequently, Plaintiff has presented no admissible evidence of actual confusion. This factor weighs in favor of Defendant.

### 4. Similarity of Products and Manner of Marketing

"The greater the similarity between the products [or services], the greater the likelihood of confusion."[166] At times, this factor is analyzed "separately considering (1) the similarity of products and (2) the similarity in the manner of marketing the products."[167] Here, with respect to "similarity

---

[164] *John Allan Co.*, 540 F.3d at 1140 (quotation marks and citation omitted).

[165] Deposition for Bryce Craven, 153:12–19; 154:17–155:19 (Aug. 27, 2008) (Dkt. No. 179, Ex. 20).

[166] *Sally Beauty Co., Inc.*, 304 F.3d at 974 (quotation marks and citation omitted).

[167] *Id.* (citation omitted).

of products [or services]," both parties offer the same service—selling contact lenses on the Internet to the public.  Moreover, both companies offer many of the same brands of lenses.  Thus, there is similarity both in the products and in the services, which weighs in favor of confusion.

With respect to "manner of marketing," Plaintiff advertises extensively on television and the Internet.  Defendant only advertises on the Internet.  The relevant market therefore is narrowed to the Internet.  On the Internet, both parties market through sponsored links.  Although the sponsored links appear on the same search page, "[t]his similarity would dispel rather than cause confusion . . . because the websites are separate and distinct, suggesting two completely unrelated business entities."[168]  Nevertheless, there is sufficient similarity in marketing that this factor weighs somewhat in favor of Plaintiff.

### 5.   Degree of Care Exercised by Purchasers

"When consumers exercise a high degree of care in selecting services, the likelihood of confusion shrinks."[169]  To purchase contact lenses, one must have a prescription and take care to ensure both the prescription and brand are correct.  Who sells the contacts, though, may be of less importance, especially if one retailer sells the same brand for less.  Thus, it is unlikely that consumers exercise a high degree of care in selecting this service.  This factor weighs in favor of confusion.

### 6.   Strength or Weakness of Plaintiff's Mark

The final factor pertains to the strength of Plaintiff's mark.  "The stronger the mark, the

---

[168] *Tana*, 611 F.3d at 778; *see also Sally Beauty Co., Inc.*, 304 F.3d at 975, which discusses that confusion is greatest when products reach the public by the same retail outlets.  In this case, the sponsored links are akin to separate retail outlets, which one must click on to enter the on-line store.

[169] *Vail Assocs.*, 516 F.3d at 872 (citation omitted).

greater the likelihood that encroachment on the mark will cause confusion."[170]  "The categories of trademarks in ascending order of relative strength are : (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."[171]  "A generic name is the name of a particular class of things or a member of such a class, and it usually answers the question 'What do you call it?'"[172] Generic terms cannot receive trademark protection.  In contrast, a descriptive term "describes the intended purpose, function or use of the goods."[173]  A term may be generic in one context, but descriptive in another.[174] For example, "contacts" is a generic term that names a particular thing, while "1800Contacts" is descriptive of the intended service of providing contact lenses.  In this case, Plaintiff's mark is descriptive.

"A descriptive mark may receive protection only when it has acquired a secondary meaning by becoming distinctive of the applicant's [services] in commerce."[175]  In other words, a descriptive mark acquires secondary meaning when the public views the mark as identifying the *source* of a product or service rather than just the product or service itself.  Once a mark obtains incontestable status, its secondary meaning cannot be challenged.[176]  This does not mean, however, that

---

[170]  *Sally Beauty Co., Inc.*, 304 F.3d at 975 (citation omitted).

[171]  *Id.* at 975–76 (citations omitted).

[172]  1-2 Anne Gilson LaLonde, Gilson on Trademarks § 2.03 (Matthew Bender 2010) (hereinafter "Gilson on Trademarks").

[173]  *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 282 (3d Cir. 2001) (quotation marks and citation omitted).

[174]  *See* 1-2 Gilson on Trademarks § 2.03.

[175]  *Sally Beauty Co., Inc.*, 304 F.3d at 976 (quotation marks and citation omitted).

[176]  *Vail Assocs.*, 516 F.3d at 867 (citation omitted).

incontestable status "dictate[s] the conclusion that the mark is strong."[177]  "To assess the relative strength of a mark, one must consider the two aspects of strength: (1) Conceptual Strength: the placement of the mark on the distinctiveness or fanciful-suggestive-descriptive spectrum; and (2) Commercial Strength:  the marketplace recognition value of the mark."[178]

       a.    *Conceptual Strength*

"A mark is strong if it is highly distinctive" meaning "the public readily accepts it as the hallmark of a particular source."[179]  A mark can be distinctive "because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both."[180] Conceptual strength focuses on the uniqueness of the mark.  The degree of use by others also may go to the mark's conceptual strength.

> A strong trademark is one that is rarely used by parties other than the owners of the trademark, while a weak trademark is one that is often used by other parties.  The greater the number of identical or more or less similar trademarks already in use on different kinds of goods [or services], the less is the likelihood of confusion between any two specific goods [or services] incorporating the weak mark.[181]

In this case, Plaintiff began using its mark in the mid-1990s when the Internet had little

---

[177]  *Id.* (quotation marks and citation omitted).

[178]  *King of the Mt. Sports, Inc.*, 185 F.3d at 1092 (quotation marks, alterations, and citation omitted).

[179]  *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) (quotation marks and citation omitted).

[180]  *Id.* (quotation marks and citations omitted).

[181]  *Vail Assocs.*, 516 F.3d at (quotation marks and citations omitted).

presence and telephone orders were more common.  Indeed, Plaintiff is a mnemonic to aid customers in remembering Plaintiff's telephone number.  When one dials a telephone number to place an order, that number only connects to one source.  Selecting its particular name in the 1990s therefore made sense.  Nonetheless, the mark itself has no distinctive component.  It is comprised of generic terms that only in combination moved it from a generic mark to a descriptive mark.

Now, the Internet has opened a new arena for marketing.  While Plaintiff's mark may have functioned well for telephone orders, it presents a problem on the Internet due to how search engines function.  When searching for a particular product, one must enter that product name as a search term.  Certainly, when searching for "contact lenses" on the Internet, it would not be surprising if such terms as "contacts, contact lenses, and contact lens" are among the most searched terms.  Thus, it also should not be surprising that companies besides Plaintiff and Defendant use these terms in their Internet advertisements.[182]  The strength of Plaintiff's mark on the Internet is weakened by the very nature of how third parties use generic and descriptive words on search engines.

Moreover, the phrase "1-800" is also used by different contact lens companies who offer customers a toll free number to call.  For example, Defendant presented evidence that the following marks currently exist for other competitors:  1-800 Any Lens; Dial a Contact Lens (1800238Lens); and 1-800 New Lens.[183]  While the court recognizes that Plaintiff's mark must be viewed as a whole, rather than by its parts, this does not nullify the problem that others necessarily must use similar generic and descriptive phrases to market their product on-line or through a toll free number.  Taking

---

[182]  *See e.g.*, Screen Shot (Dkt. No. 180, Ex. 31, Attach. A).

[183]  Patent & Trademark Office Excerpts (Dkt. No. 179, Ex. 15).

these facts together, the court concludes that Plaintiff's mark has weak conceptual strength.

>    b.    *Commercial Strength*

"The commercial strength of the mark also influences the strength of a trademark."[184]   Under the commercial-strength inquiry, one looks at the marketplace to determine if "a *substantial number* of present or prospective customers understand the [mark,] when used in connection with a business, to refer to a particular person or business enterprise."[185]   Commercial strength may be obtained, in part, "because of wide and intensive advertisement."[186]

In this case, Plaintiff has spent $220 million on advertising.  From 2003 to 2008, it spent $11 million advertising on Google alone.   Plaintiff also has presented evidence from a consumer awareness survey.   A question on the survey asks respondents:  "Which companies have you ever seen or heard of that sell contact lenses by phone, mail, or on the Internet?[187]   The first answer by a respondent is recorded.[188]   The respondent is then asked to name other companies that sell contact lenses by phone, mail, or on the Internet.[189]   In 2008, forty percent of the respondents who wore contact lenses mentioned Plaintiff first.   In contrast, only about one percent of respondents listed the

---

[184] *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, No. 1:08-cv-2376, 2010 U.S. Dist. LEXIS 66061, at *11 (N.D. Ga. June 30, 2010).

[185] *Id.* (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006)) (emphasis added).

[186] *Homeowners Group, Inc.*, 931 F.2d at 1107 (quotation marks and citations omitted).

[187] Synovate Survey, at 2 (Dkt. No. 182, Ex. 8, Attach. B).

[188] *Id.*

[189] *Id.* at 3.

next closest competitor.[190]

While the survey provides evidence that the name "1800Contacts" has marketplace recognition, it is not without its flaws. Because the survey questions asked about "phone," "mail," and "Internet" together, the survey does not disclose how many respondents recognize Plaintiff as a Internet retailer.[191] Consequently, the degree of recognition that Plaintiff has obtained on the Internet versus other marketing channels is unknowable from the survey. Separate evidence indicates, however, that Plaintiff's profits from the Internet have been increasing over the years, to the point that they now exceed Plaintiff's other marketing channels.[192] This shows an Internet presence.

A second problem with the survey results from how questions were asked versus how they were recorded. The survey asked an open-ended question about which companies a respondent had heard sold contacts by phone, mail, or the Internet. Yet, the person recording the answer had to fit the answer into a category from a close-ended list.[193] Since the survey was not double-blind, this survey design may have led to unintended interviewer bias.[194] Respondents do not always provide a clear and precise answer. Instead, people may "say, oh, I don't know, it's a 1-800 number, or they

---

[190]   *Id.* at 12.

[191]   Declaration of Hal Poret, ¶ 29 (Dkt. No. 210, Ex. A).

[192]   1-800 Contacts' Profit & Loss Statement for 2000 to 2007 (Dkt. No. 200, Ex. 23, Attach. A).

[193]   Deposition of Hal Poret, 79:2–17 (Dkt. No. 242, Ex. 2).

[194]   *See id.* at 84:9–87:19.

say, oh it's got—you know, it's contact something."[195]   Because these answers do not fit cleanly

within the close-ended list of possible responses, an interviewer, in a non-double blind study, may

be more apt to record it as the desired answer of "1800Contacts."[196]   This weakness in the survey

design lessens its probative value.

Moreover, the survey results are somewhat marginal.   Courts have found that consumer

awareness exceeding fifty percent provides good evidence while "a recognition figure of thirty-eight

percent" provides only marginal evidence.[197]   Here, forty percent of survey respondents who wore

contact lenses demonstrated market awareness of "1800Contacts."   Although this figure is closer to

marginal evidence, it is important to note that it was derived from an open-ended question that did

not suggest the answer, and it was significantly higher than the next closest competitor.

Additionally, Plaintiff has presented evidence that between the years 2003 and 2008 about 2.5

million impressions were generated on the Internet specifically matching the keyword

"1800Contacts" or a close variation.   This, too, shows some market recognition of Plaintiff.   The

number is tempered by the fact that it only represents about two-and-a-half percent of the total

impressions for Plaintiff.[198]   Thus, while the survey, advertising expenditures, Internet profits,

---

[195]  *Id.* at 90:14–21.

[196]  *Id.* at 90:21–91:11.

[197]  *Ashland Oil, Inc. v. Olymco, Inc.*, No. 94-5520, 1995 U.S. App. LEXIS 24652, at *9 (6th Cir. Aug. 21, 1995) (citing *Conopco, Inc. v. May Dep't Stores Co.*, 784 F. Supp. 648, 677 (E.D. Mo. 1992); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992)) (other citations omitted).

[198]  As stated above, most impressions for Plaintiff are generated from non-trademarked terms, such as "contacts or contact lenses" or from the particular brand of contacts, such as "acuvue or focus."

number of impressions, and the mark's incontestable status all present evidence of the mark's commercial strength, the evidence is weakened by other factors. This, combined with the mark's weak conceptual strength, indicates that Plaintiff's mark is only moderately strong.

c.    *Applicability to the Parties*

As stated above, the stronger the mark, the more likely it is that *encroachment* on the mark will cause confusion. "A strong trademark is, by definition, a trademark that triggers an immediate association with one particular source, and that association carries over to the *same mark or a similar one* used on other goods or services."[199] Thus, while strength of the mark may lead to confusion when the same or similar mark is used on other goods or services, the inverse appears true when a competitor's mark is dissimilar. For example, Coca-cola is a strong brand. If a competitor were to impose the name Coca-cola on its bottle but use a color for its label other than red and white, a consumer still may be confused as to source because "Coca-cola" signifies a distinct source. In contrast, if a competitor used its own name, such as "Shasta" on a color scheme other than red and white, it is unlikely a consumer would be confused as to source. The "strength of the mark" factor is therefore only indicative of confusion when a competitor encroaches by using the same or similar mark on its goods or services.

Here, Defendant's name bears no resemblance to Plaintiff's. Nor did its advertisements include Plaintiff's mark or a similar variation of it. Due to the strength of Plaintiff's mark, there is little possibility that a consumer would confuse Defendant with Plaintiff.[200] In contrast, a Lens.com

---

[199]  1-2 Gilson on Trademarks § 5.10.

[200]  Again, the court looks to the advertisement rather than the keyword because the keyword is invisible to the consumer and cannot be the source of confusion.

affiliate did use a similar variation of Plaintiff's mark in his advertisements.  Based on the strength of Plaintiff's mark, a consumer likely would be confused about source with respect to the affiliate's advertisements.

In sum, for Lens.com advertisements that do not use Plaintiff's mark, there is (1) overwhelming dissimilarity between Plaintiff's mark and the advertisements; (2) a neutral intent; (3) no evidence of actual confusion; (4) similarity in the products and some similarity in the manner of marketing; (5) a low degree of care exercised by consumers when purchasing contacts; and (6) little likelihood of confusion due to an inverse relationship between the strength of Plaintiff's mark and the lack of encroachment by Defendant's advertisements.  Although the fourth and fifth factors weigh in favor of Plaintiff, these factors do not have the same degree of weight as the other factors. The first factor is the "heart" of a confusion case, and it weighs strongly in defendant's favor. Moreover, the absence of confusion and lack of encroachment by Defendant's advertisements also weigh in its favor.  Taken together, these factors show there is insufficient evidence for a jury to conclude that Defendant infringed on Plaintiff's mark for all advertisements that did not use Plaintiff's mark in them.  The court therefore grants summary judgment in Defendant's favor on this issue.

For the Lens.com advertisements that did use Plaintiff's mark, namely the 65,000 impressions generated by a Lens.com affiliate, the court concludes there is a strong likelihood of confusion when the factors are considered in totality.  This does not end the analysis, however, because Plaintiff did not name the affiliate as a party.  Instead, it seeks to impose liability on Defendant for the actions of its affiliate.  Thus, the court must address whether the affiliate's action

may be imputed to Defendant.

## IV.   SECONDARY INFRINGEMENT

### A.   Inducement of Infringement and Vicarious/Joint Infringement

In its Amended Complaint, Plaintiff asserts a claim for secondary infringement against Defendant that lumps all theories of secondary liability under one cause of action.  In its briefing for summary judgment, Plaintiff also takes little care to sort out the different theories of secondary infringement, despite the fact that they have different elements.  In connection with other theories, Plaintiff asserts a claim for vicarious/joint infringement, but does not specifically develop it.  Merely asserting that a partnership exists or that one jointly infringed does not make it so, and Plaintiff has presented insufficient evidence to prove partnership or joint infringement.  In another instance, Plaintiff asserts in a footnote that Defendant is also liable under "inducement of infringement based, in part, on Lens.com's notice of the infringement and failure to communicate either that notice or instructions to its affiliates."[201]  That is the sum total of its argument.  The court will not consider theories of liability that a plaintiff spends so little effort in developing.[202]  It is the party's role to present evidence and develop theories, not the court's to cull through the evidence to see if a theory may be supported.  The court therefore grants summary judgment in Defendant's favor on the theories of "inducement of infringement" and "vicarious/joint liability."

---

[201]  Plaintiff's Mem. in Supp. of Mot. for Sum. Jdgmt., at 15 n.9.

[202]  The court notes that this decision was greatly complicated by the imprecise pleadings of Plaintiff.  Throughout its briefing, it failed to sort out the actions of Defendant from its affiliates, true trademarks from marks it merely asserts are trademarks, and so forth.  Such pleading forces the court to do the work that should have been done by the party and does little to advance one's case.

## B.       Vicarious/Agency Infringement

Another theory of secondary liability that Plaintiff asserts is vicarious liability arising from an agency relationship.   Notably, in *Mini Maid Services Co.*, the Eleventh Circuit expressly recognized that even though a licensor has a duty to supervise how a licensee utilizes the licensor's mark, it has no corresponding duty to "diligently prevent the independent acts of trademark infringement that may be committed by the [licensee]."[203]   Rather, it is the licensee who typically is "held accountable by the owner of the infringed mark."[204]   Consequently, the Lanham Act "does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent."[205]   Even if an agency relationship can arise under the Lanham Act, the facts of this case do not support such a relationship.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."[206]   Under such a relationship, an agent is charged to "act primarily for the benefit of the principal."[207]   At times a principal can be liable for the actions of an independent contractor. Specifically,

---

[203]   *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519–21 (11th Cir. 1992).

[204]   *Id.* at 1519.

[205]   *Id.* at 1520.

[206]   *Geman v. SEC*, 334 F.3d 1183, 1189 (10th Cir. 2003) (quoting *Restatement (Second) of Agency*, § 1(1) (1958)).

[207]   *Fare Deals, LTD v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 685 (D. Md. 2001) (citation omitted).

> when a principal authorizes its contractor agent to conduct and
> conclude a transaction with third parties on the principal's own
> behalf, and the principal benefits from the contracts, the principal will
> be liable in an action brought pursuant to section 43(a) of the Lanham
> Act based on the agents' *foreseeable* infringing actions . . . .[208]

Plaintiff focuses its argument on the degree of control that Defendant had over its affiliates to prevent them from bidding on certain keywords. Defendant also had control over "its website, its website link, and participation in its affiliate program."[209] The evidence supports these assertions, but the assertions miss the mark because purchase of the keywords did not constitute an infringing act. Rather, it was the language of the 65,000 impressions, which referred to Plaintiff, that created a likelihood of confusion. Only as to those impressions may Defendant be vicariously liable if an agency relationship exists.

Under the Commission Junction agreements, Defendant can set forth terms and conditions for its program that an affiliate must abide by. If an affiliate does not abide by Defendant's program detail, Defendant has the authority to terminate that affiliate from its program. Defendant also can communicate additional requirements through newsletters and other similar resources. Nonetheless, Defendant has little direct contact with affiliates, and often has no contact information for an affiliate. When Defendant learned about an affiliate using a close variation of Plaintiff's mark in an advertisement, it had no way to directly communicate with the affiliate to direct him to stop. Instead, Defendant had to ask Commission Junction to identify the affiliate and communicate to him that his actions were improper.

---

[208] *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1438 (3d Cir. 1994) (emphasis in original).

[209] Plaintiff's Mem. in Supp. of Mot. for Sum. Jdgmt., at 17.

Defendant has no authority "to monitor or supervise affiliate operations except to police their use of [Lens.com's] own service mark."[210]  Nor does Defendant exercise any degree of control over an affiliate's website.  Instead, its affiliates remain solely responsible for the content of their websites.  Although Lens.com affiliates do expend effort to promote Defendant's service mark, they nevertheless act "primarily for their own benefit."[211]  Indeed, Lens.com affiliates can promote other contact lens providers at the same time they are promoting Defendant by having links to different competitors on their websites.  Lens.com affiliates therefore do not act in a fiduciary capacity that is typical when an agency relationship exists.  Moreover, the evidence shows that affiliates typically choose the language of their advertisements.  In particular, McCoy acted autonomously in choosing the language of the 65,000 Infringing Impressions.

Additionally, Plaintiff has failed to show that McCoy was vested with authority to conduct and conclude transactions on behalf of Defendant.  McCoy's employee purchased keywords that generated impressions.  Those impressions then linked to Defendant where a customer could make a purchase.  McCoy had "no power to alter the legal relations of [Lens.com]," nor could he "bind [Lens.com] to any contract."[212]  Instead, Defendant "retain[ed] exclusive authority to accept or reject the orders of customers" who accessed its website through a McCoy advertisement.[213]  Considering these facts in totality, the court concludes that no jury could reasonably find that an agency relationship existed between Defendant and McCoy.  Hence, Defendant cannot be held vicariously

---

[210] *Fare Deals, LTD.*, 180 F. Supp. 2d at 685.

[211] *Id.* at 686.

[212] *Id.*

[213] *Id.*

liable for McCoy's actions.

## C.    Contributory Infringement

Finally, Plaintiff asserts a claim for contributory infringement.  "Contributory trademark infringement is a judicially created doctrine that derives from the common law of torts."[214]   In *Inwood Laboratories Inc. v. Ives Laboratories, Inc.*, the Supreme Court explained contributory infringement claims as follows:

> Liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another.  Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances.  Thus, [1] if a manufacturer or distributor intentionally induces another to infringe a trademark, or [2] if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorally responsible for any harm done as a result of the deceit.[215]

Although "the *Inwood* case involved a manufacturer-distributor," the Court did not limit its decision only to those situations.[216]   The Tenth Circuit has expressly extended contributory infringement to "licensors, franchisers, or to similarly situated third parties."[217]   "For contributory trademark infringement liability to lie" with a service provider, however, it "must have more than a general knowledge or reason to know that its service is being used to [infringe].   Some contemporary

---

[214]  *Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 103 (2d Cir. 2010) (citations omitted).

[215]  *Proctor & Gamble Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003) (quoting *Inwood Labs Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853–54 (1982)).

[216]  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264–65 (9th Cir. 1996).

[217]  *Proctor & Gamble Co.*, 317 F.3d at 1128 (citation omitted).

knowledge of which particular [acts] are infringing or will infringe in the future is necessary."[218]

Importantly, "the doctrine of contributory trademark infringement should not be used to require

defendants to refuse to provide a product or service to those who merely might infringe the

trademark."[219]

Here, Defendant authorized its affiliates to use its name in their advertisements;

consequently, it may be subject to the law of contributory infringement. Plaintiff, however, has not

presented any evidence that Defendant intentionally induced the affiliates to infringe on Plaintiff's

mark. At most, Plaintiff has presented evidence that Defendant did not institute negative keywords

and that it knew of some of the keywords that a few affiliates were using in their advertising efforts.

As discussed above, however, trademark liability cannot attach from the mere use of a trademark as

a keyword. Thus, none of the evidence presented by Plaintiff demonstrates that Defendant

intentionally induced its affiliates to infringe on Plaintiff's mark. Defendant therefore cannot be

liable under the first *Inwood* determinant.

Turning to the second *Inwood* determinant, Plaintiff must prove both knowledge and that

Defendant continued to supply its "service" despite knowing its affiliates were engaged in trademark

infringement. Under this prong, courts look at whether "the contributing party intended to

participate in the infringement or actually knew about the infringing activities."[220] One cannot be

---

[218] *Tiffany*, 600 F.3d at 107.

[219] *Tiffany Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 509–510 (S.D.N.Y. 2008) (citing *Inwood Labs., Inc.*, 456 U.S. at 861 (White, J., concurring)).

[220] *Mini Maid Servs. Co.*, 967 F.2d at 1522 (citing *Inwood Labs., Inc.*, 456 U.S. at 853–55) (other citations omitted).

"willfully blind," however, and escape liability.[221]  To be willfully blind, "a person must suspect wrongdoing and deliberately fail to investigate."[222]

The relevant inquiry here has been narrowed to the 65,000 Infringing Impressions generated by one Lens.com affiliate.  Because the court has concluded that all other advertisements and keyword uses were not likely to cause confusion, they cannot form the basis for contributory infringement.  With respect to the 65,000 Infringing Impressions, Plaintiff has failed to show that Defendant knew about the infringement and failed to take action or was willfully blind to it.

In April 2007, Plaintiff notified Defendant that Lens.com advertisements were appearing when search terms related to Plaintiff were entered on Google and other search engines.  Attached to that notification were a number of screen shots depicting Lens.com advertisements and advertisements from other contact lens companies.  No privacy reports were submitted with those screen shots based on the evidence that was provided to the court.[223]  Other evidence shows, however, that some of the advertisements were Goggan's and McCoy's and were triggered because they purchased Plaintiff's mark as a keyword.  Significantly, however, *none* of the attached screen shots contained the "infringing" McCoy advertisements.[224]  Instead, they were of the other, non-

---

[221] *Hard Rock Café v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992).

[222] *Id.* (citation omitted);  *see also Microsoft Corp. v. Ram Distrib., LLC*, 625 F. Supp. 2d 674, 684 (E.D. Wis. 2008).

[223] *See* Declaration of Bryan Pratt & Screen Shots (Dkt. No. 200, Ex. 37, Attach. L).

[224] *See id.*  In another exhibit, Plaintiff attached screen shots from 2005 that have certain advertisements highlighted.  *See* Reply Mem. in Supp. Mot. for Sum. Jdgmt., at 4 & Ex. 53 thereto (Dkt. No. 232 & Ex. 53).  The highlighted advertisements refer to "1800contacts" and have a link to "www.lenses-store.com."  According to Plaintiff's own exhibit, however, "www.lenses-store.com" is an affiliate of another company besides Defendant.  *See* Screen Shots, at PL016024

infringing advertisements that Goggan and McCoy generated.  Thus, in April 2007, Plaintiff did nothing more than provide general information to Defendant that a non-infringing advertisement was appearing upon entry of certain *search terms*.  Defendant therefore cannot be charged with knowledge or willful blindness based on that information.[225]  Nor did the information impose a burden on Defendant to go search out all of its affiliates' actions to make sure none of them were using Plaintiff's mark.

In August 2007, Plaintiff filed suit against Defendant.  Within the body of the complaint, Plaintiff included a screen shot showing the following advertisement:

> **1-800 Contacts**
> Simple online ordering of lenses.
> Compare our prices and Save!
> www.JustLenses.com[226]

This is one of McCoy's Infringing Impressions, and it gave notice to Defendant that an affiliate may be engaging in trademark infringement.  Plaintiff did not include, however, any other information about the screen shot in its Complaint.  Lens.com cannot determine from a mere screen shot alone

---

(item no. 4) (Dkt. No. 232, Ex. 53).  It is therefore unclear why the advertisement was highlighted.  What is clear, however, is that none of the 2005 Lens.com advertisements referred to "1800contacts," nor has Plaintiff alleged that they did.

[225]  Since 2005, Plaintiff has been sending screen shots to Defendant, which have shown permissible forms of advertising.  Consequently, the screen shots alone were insufficient to create a suspicion of wrongdoing by an affiliate.  Moreover, McCoy was the first *and* last Lens.com affiliate to use the "infringing" advertisements.  Thus, there was no pattern of behavior to alert Defendant of possible wrongdoing and a need to investigate.

[226]  Complaint, ¶ 21 (Dkt. No. 1).

which affiliate generated an impression.[227]  Thus, while Plaintiff may have notified Defendant about

the issue in August 2007, it did not provide Defendant with sufficient information for it to determine

immediately who the affiliate was.   Defendant has 10,000 affiliate relationships.   Because

contributory trademark infringement does not require a defendant "to refuse to provide a product or

service to those who merely might infringe the trademark," Lens.com had no obligation to cease

licensing its name to all of its affiliates while it took steps to identify the one who generated this

particular impression.

Once a lawsuit is filed, it takes time to address issues raised in a complaint.  E-mails with

Commission Junction show, however, that Defendant was communicating with Commission

Junction about the lawsuit and trying to resolve the problem.[228]  In an e-mail dated November 12,

2007, the program manager for Defendant's accounts stated that Lens.com had met with an affiliate

on October 12, 2007 to inform him to implement negative keywords.[229]  The same e-mail stated that

Defendant had asked Commission Junction to research trademark violators in a previous e-mail, but

how that would occur was still being worked out.[230]

---

[227]  *See* Declaration of Bryce Craven, ¶¶ 14–15 (Dkt. No. 182, Ex. 12) (discussing that one way to determine who generated an advertisement is through a privacy report).  Bryce Craven is the search marketing manager for Plaintiff, who monitors usage of Plaintiff's service mark.  His declaration demonstrates that one cannot tell from a mere screen shot alone who generated an advertisement.

[228]  Defendant also was communicating with others to resolve the issue.  *See* E-mail re Lens.com - 1-800 CONTACTS Marks (Nov. 16, 2007) (Dkt. No. 200, Ex. 34).

[229]  E-mail from Joseph McGinnis to Leslie Siggins (Nov. 12, 2007) (Dkt. No. 209, Ex. 46). Leslie Siggins was a paralegal at Commission Junction.

[230]  *See also* Deposition of Joseph R. McGinnis, 149:14–151:19 (Aug. 8, 2008) (Dkt. No. 229, Ex. 69) (discussing difficulties in identifying who was bidding on certain keywords).

In another e-mail, dated November 14, 2007, the program manager stated that Lens.com had "been having me contact publisher[s] for different terms such as 1800contacts and Vision Direct and asking the publishers to please stop bidding on those specific terms.  Publishers so far have been removing the keywords."[231]  In a third e-mail, dated November 16, 2007, Defendant sent another e-mail to Commission Junction that stated "[p]lease find attached a file with a few affiliates that need to be addressed ASAP."[232]

Attached to the e-mail was a spreadsheet that listed addresses for search-results pages and link destinations.  Commission Junction used that information to identify and contact the specific affiliates at issue.  Commission Junction informed Lens.com, however, that "[a] number of the links are not associated with a Commission Junction publisher from what I can see."[233]  Thus, even with specific Internet addresses for the search-results pages and link destinations, the evidence shows that Defendant itself could not identify affiliates.  Only Commission Junction had that information for its affiliate network.  While it is true that once Commission Junction had the addresses, it was able to contact the affiliates and have them stop their actions within one day, that fact does not account for the effort and time it took to locate the addresses for search-results pages and link destinations. It is apparent from the e-mails, that it was not a one day process or even a one month process.

Even viewing the evidence in the light most favorable to Plaintiff, there is insufficient evidence to show that Defendant failed to take appropriate action to stop McCoy from publishing

---

[231]  E-mail from Joseph McGinnis to Leslie Siggins (Nov. 14, 2007) (Dkt. No. 209, Ex. 51). A "publisher" is another name for an affiliate.

[232]  E-mail Chain (Nov. 16, 2007) (Dkt. No. 209, Ex. 53).

[233]  *Id.*

the advertisements.  There is no indication that Defendant intended to benefit from the Infringing Impressions, nor is there evidence of how many Infringing Impressions and clicks occurred during the relevant time period.[234]  Accordingly, the court concludes that Defendant cannot be held liable for contributory infringement.

## V.   BREACH OF CONTRACT

Plaintiff asserts that Defendant breached the parties' oral agreement that Defendant would not purchase Plaintiff's mark or variations thereof as a keyword.  "Most contracts bind only those who bargain for them, and the burden of proof for showing the parties' mutual assent as to all material terms and conditions is on the party claiming that there is a contract."[235]  When "determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on complete and definite terms."[236]  If material terms are missing or indefinite, an agreement cannot be enforced.[237]

Plaintiff contends the e-mails exchanged between the parties' attorneys "verify the material terms of the oral agreement."[238]  This is a remarkable statement given the scope of what Plaintiff claims the agreement embodies.  According to Plaintiff's attorney who sent the e-mails,

---

[234]  One could reasonably conclude, however, that it is less than the 352 clicks reported because the relevant time period commenced in August 2007, not April 2007.

[235]  *Bybee v. Abdulla*, 2008 UT 35, ¶ 8, 189 P.3d 40 (quotation marks and citations omitted).

[236]  *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 22, 989 P.2d 1077 (citation omitted).

[237]  *See Firkins v. Ruegner*, 2009 UT App 167, ¶ 2, 213 P.3d 895 (citations omitted).

[238]  Plaintiff's Mem. in Opp'n to Mot. for Sum. Jdgmt., at 32.

> [t]he main thrust of the agreement was that neither parties'
> advertisements should be appearing on Internet searches for the
> tradename of the other, if informed of such occurrence.   More
> specifically, upon notice of any such advertisement, Lens.com would
> ensure that no advertisements for Lens.com would appear in response
> to searches for 1-800 Contacts' trademarks on Internet search
> engines.[239]

Moreover, Plaintiff contends the agreement precludes Defendant and its affiliates from purchasing

"1800Contacts," or any variant, as keywords.[240]  It also "explicitly" provides that Defendant would

look into any future advertisement brought to its attention and would take steps to implement

negative keywords or inform affiliates to alter its keyword purchases.  In contrast, 1-800 Contacts

merely agreed not to purchase Lens.com as a keyword and to investigate any advertisement derived

from the term.  Finally, according to Plaintiff, these terms were so simple that neither party

contemplated reducing them to writing.

   Were this actually an agreement entered into by the parties, the court questions whether it

would survive an antitrust challenge.[241]  Plaintiff does not seek merely to preclude usage of its

trademark.  Instead, it wants to obliterate any other competitor advertisement from appearing on a

search-results page when a consumer types in "1800Contacts" as a *search term* or some variation

of it.  This is disturbing given that broad matching of the generic term "contacts" could trigger an

advertisement if a consumer enters the search term "1800Contacts."  A trademark right does not

grant its owner the right to stamp out every competitor advertisement.

---

[239]  Declaration of Bryan Pratt, ¶ 7 (Dkt. No. 200, Ex. 37).

[240]  *See id.* ¶ 8.

[241]  "Section 1 of the Sherman Act provides that 'every contract . . . in restraint of trade or commerce among the several States . . . is declared to be illegal.'"  *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988) (quoting 15 U.S.C. § 1).

Furthermore, the e-mails at issue do not contain the purported contractual terms, nor does the evidence show a meeting of the minds. When questioned during deposition about "the agreement," Defendant's owner stated, "I don't know what was agreed there. I think it was between the attorneys."[242] He understood that if Plaintiff raised an issue, he would look into it and try to address it and Plaintiff would do the same.[243] This understanding does not rise to the level of an agreement to remove all advertisements from a search page anytime a consumer searches for "1800Contacts" or one of the ever expanding variations that Plaintiff seeks to garner for itself.[244]

Although one e-mail does address instituting negative keywords, the e-mail also states that Plaintiff appreciated Defendant being willing to work towards an amicable solution. Such phrasing indicates the parties were still working out a resolution and had not reached a meeting of the minds. Furthermore, the e-mail fails to discuss what negative keywords Plaintiff would institute (although Plaintiff asserts it agreed to implement "Lens.com" as a negative keyword), dates of implementation, what parties were agreeing to the terms, how those terms would be applied to affiliates, and so forth.

Moreover, the language and tone of the e-mails do not indicate an oral contract had been formed. Rather, the e-mails repeatedly say, "[w]e hope for a continued amicable relationship in resolving these situations," and then they ask for details about what actions would be taken to remedy the situation. If there were a contract, one would think the e-mails would point out the contractual obligations and not merely hope for an amicable relationship. Further, Plaintiff would

---

[242] Deposition of Cary Samourkachian, 50:4–5 (Aug. 21, 2008) (Dkt. No. 200, Ex 40).

[243] *Id.* at 50:7–12; 51:14–16.

[244] In its briefing for summary judgment, Plaintiff claimed "1-800 contact lenses; 1800 contact lenses; and 800 contact lenses" also were its trademarks." Plaintiff's Mem. in Supp. of Mot. for Sum. Jdgmt., ¶ 23.

not have to ask what actions would be taken if there were a contract that explicitly set forth certain requirements.  Instead of confirming the existence of a contract, the e-mails merely confirm an amicable resolution of a disagreement among competitors.  Accordingly, the court concludes as a matter of law that no enforceable agreement was entered into between the parties.

## VI.   OTHER CAUSES OF ACTION

### A.     Unfair Practices Act

Plaintiff also asserts a claim for "Common Law Unfair Competition, Misappropriation, and Trademark Infringement" and "Unfair Practices Act—Utah Code Ann. § 13-5-1 *et seq.*" all under one cause of action.[245]  It asserts under one sentence that "Lens.com continues to misappropriate the valuable goodwill of the 1-800 CONTACTS Marks, to infringe 1-800 CONTACTS' rights therein, and to unfairly compete with 1-800 CONTACTS under the common law and the laws of Utah."[246] It then asserts under the next sentence that "Lens.com's use of the 1-800 CONTACTS Marks to promote, market or sell products and devices constitutes an unfair practice under Utah Code Ann. § 13-5-1 *et seq.*"[247]  Thus, Plaintiff appears to be asserting two different claims under one cause of action.

Defendant moves for summary judgment on the Unfair Practices Act claim on the basis that Plaintiff has failed to come forward with evidence to support such a cause of action.  In its opposition memorandum, Plaintiff did not provide any argument against summary judgment on this claim.  The court therefore grants summary judgment in Defendant's favor and dismisses this claim.

---

[245]  Amended Complaint, Count IV (Dkt. No. 54, Ex. 1).

[246]  *Id.* ¶ 66.

[247]  *Id.*

### B.    Common Law Unfair Competition, Misappropriation, and Trademark Infringement

Plaintiff asserts the test for unfair competition under Utah law is the same as the test under the Lanham Act.   It also summarily asserts that summary judgment is inappropriate on the misappropriation claim because the evidence supports that Defendant misappropriated Plaintiff's mark and caused likelihood of confusion.   Little other argument was presented by Plaintiff.

The court applies the same reasoning to these common law claims that it did for the Lanham Act claims, which is, use alone of another's mark as a keyword is insufficient to support a claim of infringement, unfair competition, or misappropriation of good will.   Moreover, the mere appearance of a Lens.com link in response to the search term "1800Contacts" is unlikely to cause confuse due to the great dissimilarity between Defendant's name and advertisements and Plaintiff's mark.   The court therefore grants summary judgment in Defendant's favor on these claims as well.

### C.    Unjust Enrichment

Finally, Plaintiff has asserted a claim for unjust enrichment.   To support a claim for unjust enrichment, Plaintiff must prove (1) it conferred a benefit on Defendant; (2) Defendant appreciated the benefit or had knowledge of it; and (3) it would be inequitable for Defendant to accept or "retain the benefit without payment of its value."[248]   With trademark infringement, "[t]he unjust enrichment theory is based on the idea that trademarks are protected property rights," and that "misappropriation of that right" constitutes unjust enrichment.[249]

Here, Plaintiff has not shown that use of its service mark as a keyword constitutes

---

[248]  *Rawlings v. Rawlings* 2010 UT 52, ¶ 29, 240 P.3d 754.

[249]  *Western Diversified Servs. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005).

infringement.  Yet, it wants payment for that use.  As discussed above, however, not all uses of a trademark are actionable.  Stated differently, while the law protects one's property right in a trademark, the scope of that protection is not without its limits.  Use outside of the scope of that property protection is not a use that is unjust to retain without payment.  Indeed, if Plaintiff were able to obtain payment under unjust enrichment, common law would effectively expand the scope of Plaintiff's statutory protection.  Because one generally cannot extend legal rights beyond one's property rights, the court grants summary judgment in Defendant's favor on this claim.

## VII.  OTHER MOTIONS

### A.  Plaintiff's Motion to Strike Certain "Evidence"

Plaintiff has moved to strike the following evidence that Defendant relied on in its summary judgment briefing.

#### 1.  Google, Inc's Brief (Defendant's Exhibit 19)

Defendant submitted a brief filed by Google, Inc. in another case.  Plaintiff moves to strike the brief as inadmissible hearsay.  Because the brief was not necessary to resolve the motions for summary judgment, the court did not reference or rely on it.

#### 2.  Expert Report of Richard S. Hoffman (Defendant's Exhibit 30)

Defendant submitted an expert report from Richard S. Hoffman to address the issue of damages.  Plaintiff moves to strike the brief as inadmissible hearsay.  The court did not need to reach the issue of damages because it ruled in Defendant's favor.  Accordingly, the court did not reference or rely on Hoffman's expert report.

#### 3.  Declaration of Anthony DeGidio (Defendant's Exhibit 31)

Plaintiff moves to strike Anthony DeGidio's declaration on the grounds that he was not

properly identified as a witness and he refused to be deposed.  In this decision, the court did not cite to or rely upon DeGidio's declaration.  Rather, it cited to the e-mails that were attached to the declaration.  The same e-mails also were attached by *Plaintiff* to Pratt's declaration.  Consequently, even if the court struck the e-mails attached to DeGidio's declaration, the same e-mails would be in evidence based on Pratt's declaration.  Because the court did not reference or rely on DeGidio declaration and the attached e-mails are in evidence through Plaintiff, the issue is moot.

4.      Screen Shot (Defendant's Exhibit 35)

Defendant submitted a screen shot to show Plaintiff's advertisement appeared in response to the search term "lens.com."  Plaintiff moves to strike the screen shot on the grounds that it is unauthenticated and purportedly false.  Because the screen shot was not necessary to resolve the motions for summary judgment, the court did not reference or rely on it.

Because the court did not reference or rely upon these four exhibits, Plaintiff's motion to strike this evidence is denied as moot.

**B.      Plaintiff's Motion to Strike Affirmative Defenses Five Through Eight**

Plaintiff also has moved to strike Defendant's affirmative defenses five, six, seven, and eight. Based on the court's ruling in Defendant's favor, the affirmative defenses are now moot.  The court therefore denies the motion.

**CONCLUSION**

For the reasons stated above, the court hereby:

1.      Grants in part and denies in part Plaintiff's motion for partial summary judgment.[250]

---

[250] Dkt. No. 171.

Plaintiff moved for summary judgment on Lens.com's defense that the purchase of keywords did not constitute a "use" in commerce.  The court grants Plaintiff's motion on this issue.  The court denies Plaintiff's motion on all other grounds;

2.      Grants Defendant's Motion for Summary Judgment,[251] and dismisses all claims and causes of action against it;

3.      Grants in part and denies in part Defendant's Motion to Strike Benjamin Edelman's Declaration;[252]

4.      Denies as moot Plaintiff's motion to strike certain evidence;[253] and

5.      Denies as moot Plaintiff's motion to strike affirmative defenses 5–8.[254]

DATED this 14th day of December, 2010.

                                                BY THE COURT:


                                                _____
                                                Clark Waddoups
                                                United States District Judge

---

[251]  Dkt. No. 174.

[252]  Dkt. No. 195

[253]  Dkt. No. 202.

[254]  Dkt. No. 135.